**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| ALLIED WORLD ASSURANCE COMPANY, <br>     *Plaintiff,* <br>  vs. <br> STEADFAST INSURANCE COMPANY, <br>     *Defendant.* | CIVIL ACTION <br> NO. 2:14-cv-02511-GAM |

# BRIEF OF DEFENDANT STEADFAST INSURANCE COMPANY IN SUPPORT OF ITS MOTION FOR SUMMARY JUDGMENT

                LOUIS A. BOVE, ESQUIRE
                MARC J. SYKEN, ESQUIRE
                lbove@bodellbove.com
                msyken@bodellbove.com
                PA Identification Nos. 53071/PA 62533
                **BODELL BOVE, LLC**
                1529 Walnut Street
                Philadelphia, PA 19102
                (215) 864-6600
                (215) 864-6610 (Telefacsimile)
                Attorney for Defendant, Steadfast Insurance Company

# TABLE OF CONTENTS

TABLE OF AUTHORITIES .................................................. ii

I.   INTRODUCTION ................................................. 1

II.  FACTUAL BACKGROUND ........................................... 1

III. STATEMENT OF QUESTIONS PRESENTED ........................... 5-6

IV.  LEGAL ARGUMENT ............................................... 6

     A.   STANDARD FOR SUMMARY JUDGMENT ............................ 6
     B.   STEADFAST HAD THE RIGHT TO PARTICIPATE IN THE
          DEFENSE OF PMMC ........................................ 7
     C.   THE PAYMENT OF DEFENSE EXPENSES REDUCED THE
          LIMITS OF THE STEADFAST POLICY ........................ 12

V.   CONCLUSION .................................................. 16

# **TABLE OF AUTHORITIES**

**Caselaw**

*Atl. Cas. Ins. Co. v. Norton*,
No.: 3:12-CV-650, 2015 U.S. Dist. LEXIS 35731 (E.D. Tenn. Mar. 23, 2015) . . . . . . . . . . . . 11

*Crozer Chester Medical Center v. Medical Professional Liability Catastrophe Loss Fund*,
713 A.2d 1196 (Pa. Cmwlth. 1998), *aff'd*, 555 Pa.558, 725 A.2d 755 (1999) . . . . . . . . . . . . . . 10

*E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*,
No. 6:04-CV-165, 2011 U.S. Dist. LEXIS 18918 (E.D. Tex. Feb. 25, 2011) . . . . . . . . . . . . 10-11

*Fireman's Fund Ins. Co. v. Empire Fire & Marine Insurance Company*,
155 F. Supp. 2d 429 (E.D. Pa. 2001) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6

*Fireman's Fund Ins. Co. v. Zurich Am. Ins. Co.*,
No. 10-cv-4293, 2011 U.S. Dist. LEXIS 78906 (E.D. Pa. 2011) . . . . . . . . . . . . . . . . . . . . . . . 14

*Genaeya Corp. v. Harco Nat'l Ins. Co.*, 991 A.2d 342 (Pa. Super. 2010)) . . . . . . . . . . . . . . . 9-10

*Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195 (2000) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

*Madison Constr. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595 (1999) . . . . . . . . . . . . . . . . 6-7, 11

*Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758 (Tenn. 2006) . . . . . . . . . . . . . . . . . . . . . . 7

*Smithart v. John Hancock Mut. Life Ins. Co.*,
167 Tenn. 513, 71 S.W.2d 1059 (Tenn. 1934) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Southern Sec. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*,
2005 Tenn. App. LEXIS 815 (Tenn. Ct. App. 2005) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Standard Fire Ins. Co. v. Chester-O'Donley & Assocs.*,
972 S.W.2d 1 (Tenn. Ct. App. 1998) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7

*Travelers Indem. Co. of Am. v. Moore & Assocs.*, 216 S.W.3d 302 (Tenn. 2007) . . . . . . . . . . . 7

*Yellowbird Bus Co. v. Lexington Ins. Co.*, No. 09-5835, 2010 U.S.Dist. LEXIS 69554 (E.D. Pa.
2010), *aff'd.*, 450 Fed. Appx. 213 (3d Cir. 2011) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14-15

## I. INTRODUCTION

Faced with a verdict that was 73 million dollars in excess of its insured's underlying limit of coverage, Steadfast exercised its right to retain counsel to participate in the defense of its insured in post-trial and appellate proceedings. Steadfast, under the terms of its Policy, had the absolute right to participate in the defense of any claim that in its judgment may exceed its underlying limit. The defense costs incurred by Steadfast in exercising that right reduced the limits of the Steadfast Policy. Steadfast exhausted its limit per the terms of its Policy through the payment of settlement monies to the tort plaintiffs as well as defense expenses, and Allied's attempt to extract even further monies from Steadfast, after Steadfast stepped in and secured a resolution favorable to all parties, should be rejected.

## II. FACTUAL BACKGROUND

A $78,404,669 verdict was entered against Steadfast's insured, Pottstown Memorial Medical Center ("PMMC") in *Upsey v. Pottstown Memorial Medical Center, et al*, CCP Philadelphia County, November Term 2009, No. 004525 (the "Upsey Litigation"). The Upsey Litigation involved a Philadelphia County medical malpractice action arising out of the delivery of Parrys Nicholson-Upsey at PMMC. The Upsey plaintiffs claimed the health care providers were negligent, *inter alia*, for not timely delivering Parrys Nicholson-Upsey. Upon presentation at PMMC on August 10, 2008, the obstetrician was not able to detect a fetal heart beat or movement, and apparently advised the Upsey family that the baby had died. This initial diagnosis proved incorrect, as baby Upsey was delivered alive more than an hour later, after an ultrasound technician discovered a fetal heart rate.

The Upsey Litigation was initiated on November 25, 2009, and the case proceeded to trial, with opening statements taking place on April 16, 2012. On April 27, PMMC wrote to Steadfast tendering its defense:

> Please consider this letter as formal notification that Community Health Systems Professional Services Corporation hereby tenders Pottstown Memorial Medical Center's $5,000,000 SIR to Zurich relative to the above-captioned matter.

*See* PMMC correspondence of April 27, 2012 at Exh. "A."

The Upsey plaintiffs never issued a demand within the Steadfast limit. The jury rendered its verdict solely against PMMC on May 4, 2012, finding in favor of the other health care defendants.[1] *See* Verdict Sheet at Exh. "B." The coverage available to PMMC included the following:

| | |
|---|---|
| PMMC Self Insured Retention (SIR): | $5,000,000 |
| Steadfast (first excess layer): | $20,000,000 |
| Allied (second excess layer): | $25,000,000 |

Following the verdict, Steadfast hired Ronald Schiller, Esq. of Hangley Aronchick Segal Pudlin & Schiller (the "Schiller Firm") on May 8, 2012, to also serve as counsel on behalf of PMMC.[2] Steadfast acted pursuant to the terms of its Policy which afforded Steadfast the right to participate in the defense of a claim that may exceed the underlying limit available to PMMC.

> C. If "Underlying Insurance" or any "Other Insurance" exists, we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any "Occurrence", "Medical Incident" or "Claim" against the Insured that in our judgment may exceed that "Applicable Underlying Limit".

*See* Health Care Umbrella Liability Policy (HCULP), Common Policy Provisions, (U-HCU-700-B CW (07/03)), at ¶III C.

---

[1] The other defendants on the verdict sheet were the obstetrician and neotatologist. Initially the obstetrician had maintained that the baby simply came back to life after the earlier ultrasound failed to detect a heart beat. The obstetrician later testified at the end of the trial that the baby was in fact alive at the time of the earlier ultrasound, and that her heartbeat was undetectable on the type of ultrasound machine that had been utilized at PMMC.

[2] The law firm of Gross McGinley, who defended PMMC through the $78,404,669 verdict remained as counsel to PMMC.

The trial court denied PMMC's request for post-trial relief. A Praecipe for Judgment against PMMC in the amount of $69,216,792.35 was entered on October 1, 2012. *See* Praecipe to Enter Judgment at Exh. "C."

Following the entry of judgment, Schiller's office filed a Notice of Appeal to the Superior Court at *Upsey v. Pottstown Memorial Medical Center, et al*, Superior Court No. 2923 EDA 2012 (the "Upsey Appeal") on October 25, 2012. *See* Notice of Appeal at Exh. "D." PMMC filed a Praecipe to File Superseadeas Bonds for $11,664,944, and $20,000,000. The trial court issued its opinion supporting its denial of PMMC's post-trial motions on or about May 7, 2013, which prompted the Superior Court to issue its briefing schedule.

On May 23, 2013, Allied wrote to PMMC and Steadfast urging that efforts at settlement be undertaken.[3] In its correspondence to Steadfast, Allied also stated as follows:

> Based upon our review of the Zurich Policy, CHS's self-insured retention of $5 Million may only be satisfied through the payment of claims against CHS and will not be eroded through the payment of any defense costs. Therefore, notwithstanding any defense costs incurred by CHS to date, including any attorney's fees or other costs on appeal, Allied World understands that CHS's $5 Million self-insured retention under the Zurich Policy remains intact and available for resolution of this claim. We also understand, from you, that CHS has made its full $5 Million available for settlement. Finally, Allied World understands that the full limit of $20 Million under the Zurich Policy also remains available for settlement.

Allied-PMMC/Steadfast, May 23, 2013, at Exhibit "L."

This statement is inconsistent with the terms of the Steadfast Policy, as the Policy was amended to provide that the payment of defense expenses by Steadfast reduced the limit of the Steadfast Policy. Per the terms of the Steadfast Policy, the erosion of the Steadfast limit is not dependent upon whether the PMMC SIR limit remained intact. In response to Allied's

---

[3]This was contrary to the instructions of PMMC, who believed that PMMC would be in a stronger settlement position once its defenses were briefed with the Superior Court.

-3-

correspondence, Steadfast wrote to Allied and advised that Steadfast's limit in fact had already been reduced by the payment of defense expenses.

> Initially, let me respond to AWAC's understanding "that the full limit of $20 million under the Zurich Policy also remains available for settlement." I understand this to question whether the Zurich $20 million aggregate limit of liability has been impaired or eroded. The Zurich aggregate policy limit has been reduced by certain defense expenses, including the cost of that portion of the appeal bond which corresponds to Zurich's policy limit ($60,000) and attorneys' fees and litigation expenses Zurich has incurred in connection with the appeal (specifically the Hangley Aronchick & Schiller firm's fees and expenses, which total $403,957.18 through June 1, 2013 with the costs continuing to accrue after that date).

*See* Steadfast correspondence of June 24, 2013, at Exhibit "M."

Thus, Allied was well aware that the defense expenses being incurred by Steadfast, which inured to the benefit of both excess carriers, reduced the applicable Steadfast limit. Allied never took exception to this communication until after the settlement was achieved at mediation.

Upon the issuance of the briefing schedule, Schiller's office engaged in the following activities:

- Filed PMMC's Brief with the Superior Court on June 24, 2013, see Exh "E";

- Filed PMMC Reply brief on August 7, 2013, see Exh. "F";

- Arranged for a mediation before JAMS with the Upsey Plaintiffs;

- Submitted mediation filings on behalf of PMMC to JAMS, see Exh. "H"; and

- Secured a settlement on behalf PMMC for $31.5 Million Dollars.

The settlement achieved by the Schiller firm on behalf of PMMC was approximately $7,250,000 *less* than the present value of the jury's award, exclusive of delay damages and post-judgment interest.[4] Had the matter not settled at mediation, the Schiller firm was prepared to argue

---

[4] Allied averred in its Complaint that the "total amount of the jury's award bore a net present value of approximately $38.77 Million (exclusive of delay damages and post-judgment interest)." Allied Complt., at ¶16 (Document 1).

-4-

the matter before the Superior Court on behalf of PMMC. In deciding which lawyer at the Schiller firm would present the argument, counsel from the Gross McGinley firm noted that while attorney Mark Aronchick's reputation was of the "very highest order of magnitude," Schiller was as good as there was, and provided the perfect "counter-punch" to the Upsey's own counsel.

> Ron [Schiller] is as good a lawyer as I have seen, is clearly at the very top of his game, and we trust him 100%. He undoubtedly knows more about this case, and his temperament and logical thinking are the perfect counter-punch to Weinstock's. Putting aside the first call entirely, I question whether I would choose Mark over Ron. I honestly do. When the first call is factored in, it makes that decision all the more difficult. I entirely understand that Mark is a more recognizable name than Ron, at least within the isolated world of the judges on the Superior Court, and that his [Aronchick] reputation is of the very highest order of magnitude. I don't question those things at all. They are undoubtedly true. I question whether those realities are just a function of Mark's having been at it longer than Ron, though. I am sure that Mark will be prepared for the argument, and that he will do well, and that his persona will be a help to us. But, I'd still pick Ron, all things considered. And, that is a complement to Ron, not a criticism of Mark.

*See* Gross McGinley electronic communication, September 16, 2013, at Exh."G."

Consistent with the terms of its Policy, Steadfast exhausted its $20,000,0000 limit through the payment of $751,765.00 in defense expenses, which reduced the limit of the Steadfast Policy, and the payment of $19,248,235 to the Upsey tort plaintiffs. Allied paid the balance of the settlement, and now contends that the payment of $751,765.00 in defense expenses by Steadfast should not have eroded the Steadfast limit. Of note, Schiller's retention and assistance in the defense of PMMC ultimately reduced Allied's indemnity payment by an amount that is far more than Allied now seeks from Steadfast.

### III. STATEMENT OF QUESTIONS PRESENTED

Allied and Steadfast have entered into a Stipulation[5] limiting the issues in the litigation as follows:

---

[5] *See* Stipulation at Exh. "I."

**A.** Whether Steadfast Insurance Company had the right to participate in the defense of Pottstown Memorial Medical Center in the litigation styled *Upsey v. Pottstown Memorial Medical Center, et al*, CCP Philadelphia County, November Term 2009, No. 004525/Superior Court No. 2923 EDA 2012, and retain the law firm of Hangley Aronchick Segal Pudlin & Schiller (the "Schiller Firm") to represent Pottstown Memorial Medical Center?

Suggested Answer: Yes.

**B.** Whether the fees paid by Steadfast Insurance Company to the Schiller Firm for its defense of Pottstown Memorial Medical Center, reduced the limits of the Steadfast Insurance Company Health Care Umbrella Liability Policy GLO HPC 5346837-04?

Suggested Answer: Yes.

## IV. LEGAL ARGUMENT

### A. Standard for Summary Judgment

The standard for ruling upon a summary judgment motion in an insurance coverage action is set forth in *Fireman's Fund Insurance Company v. Empire Fire & Marine Insurance Company*, 155 F. Supp. 2d 429 (E.D. Pa. 2001):

> The interpretation of an insurance policy is a question of law. Whether a particular loss is within the coverage of an insurance policy is such a question of law and may be decided on a motion for summary judgment in a declaratory judgment action. Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law.

*Id.* at 431 n.1 (internal citations omitted).

The standard for interpreting an insurance policy in Pennsylvania is also well established:

> The task of interpreting [an insurance] contract is generally performed by a court rather than by a jury. The goal of that task is, of course, to ascertain the intent of the parties as manifested by the language of the written instrument. Where a provision of a policy is ambiguous, the policy provision is to be construed in favor of the

insured and against the insurer, the drafter of the agreement. Where, however, the language of the contract is clear and unambiguous, a court is required to give effect to that language.

*Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999).[6]

### B. Steadfast Had the Right to Participate in the Defense of PMMC

The rendering of a verdict that was 73 million dollars in excess of PMMC's SIR triggered Steafast's right to participate in the defense of PMMC. Steadfast issued Health Care Umbrella Liability Policy GLO HPC 5346837-04 (the "Steadfast Policy") to Community Health Systems, Inc., effective June 1, 2009 through June 1, 2010, with a Specific Loss Limit of $20,000,000 and a Health Care Professional Liability Aggregate Limit of $20,000,000. *See* Steadfast Policy at Exh. "J." Steadfast was vested with the right, though not the duty, to participate in the defense of a "Claim" that in Steadfast's judgment may exceed its underlying limit.

> C. If "Underlying Insurance" or any "Other Insurance" exists, we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any "Occurrence", "Medical Incident" or "Claim"[7] against the Insured that in our judgment may exceed that "Applicable Underlying Limit".

*See* Health Care Umbrella Liability Policy (HCULP), Common Policy Provisions, (U-HCU-700-B

---

[6]The Steadfast Policy was delivered in Tennessee. To the extent that this Court determines that Tennessee law governs the terms of the Steadfast Policy, Steadfast notes that Tennessee employs a standard similar to *Madison* for interpreting insuring agreements. *See Travelers Indem. Co. of Am. v. Moore & Assocs.*, 216 S.W.3d 302, 306 (Tenn. 2007) ("An insurance contract 'must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning.' *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 768 (Tenn. 2006). In addition, '[i]nsurance policies should be construed as a whole in a reasonable and logical manner.' *Chester-O'Donley*, 972 S.W.2d at 7."); *Southern Sec. Fed. Credit Union v. Cumis Ins. Soc'y, Inc.*, 2005 Tenn. App. LEXIS 815 (Tenn. Ct. App. 2005) (noting "[i]t is the function of a court to interpret and enforce contracts as they are written, notwithstanding they may contain terms which my be thought harsh and unjust. A court is not at liberty to make a new contract for parties who have spoken for themselves.") (citing *Smithart v. John Hancock Mut. Life Ins. Co.*, 167 Tenn. 513, 71 S.W.2d 1059, 1063 (Tenn. 1934)).

[7]The term "Claim" is defined to mean "a 'Suit' or demand for damages to which this insurance applies." HCULP, Common Policy Provisions, at ¶X.F. "Suit" includes a "civil proceeding in which damages are sought to which this insurance applies." *Id*. at ¶EE.

CW (07/03)), at ¶III C. (Steadfast 4505).

The term "Applicable Underlying Limit" is defined as follows:

"Applicable Underlying Limit" means "the total of all available limits of insurance for the applicable 'Underlying Insurance' plus any 'Other Insurance'. For the purposes of determining the 'Applicable Underlying Limit' the limits of insurance for any 'Underlying Insurance' or 'other insurance' will apply even if the insurer providing the 'Underlying Insurance' or 'Other Insurance' claims the Insured failed to comply with any condition of the policy; or that Insurer becomes bankrupt or insolvent. Any aggregate limit of insurance provided by an insurance policy within the 'Applicable Underlying Limit' shall be considered eroded or exhausted only by the actual payment of 'Claims' that would be insured by the provisions of this policy. Any 'Self-Insured Retention' aggregate amount within the 'Applicable Underlying Limit' shall be considered eroded or exhausted only by the actual payment of 'Claims' that would be insured by the provisions of this policy.

*See* Endorsement #5, "'Defense Expenses' In Addition to Self-Insured Retention Endorsement" (Steadfast 4540-4541).

The "total of all available limits of insurance for the applicable 'Underlying Insurance' plus any 'Other Insurance'" is $5,000,000, as the term "Underlying Insurance" is defined to include "the insurance policies listed in the Schedule of Underlying Insurance, and any 'Self Insured Retention' listed in the Schedule of Underlying Self Insurance." *See* HCULP, Common Policy Provisions, at ¶X.GG. (Steadfast 4520). The "Schedule of Underlying Self Insurance" for "Professional Liability" identifies the "Each Medical Incident Limit" as $5,000,000." *See* Schedule at U-HCU-702-A-CW (07/03)) (Steadfast 4503). As to "Other Insurance," there is no such coverage other than the previously identified SIR.[8]

---

[8]Other Insurance is defined as follows:

"Other Insurance" means a policy of insurance providing coverage that this policy also provides.
"Other Insurance" includes any type of self insurance or other mechanism by which an Insured arranges for funding of legal liability.
"Other Insurance" does not include "Underlying Insurance" or a policy of insurance specifically purchased to be excess of this policy.

HCULP, Common Policy Provisions, at ¶X.S. (Steadfast 4518).

-8-

Following the verdict, Steadfast was presented with a "Claim" that not only *may* have exceeded the "Applicable Underlying Limit," but did in fact exceed that limit, and Steadfast had the right to participate in the defense of PMMC per the terms of its Policy. Steadfast's right to participate in the defense of PMMC was not in any way dependent upon whether the "Applicable Underlying Limit" had been exhausted, but turned instead on whether "the Claim" - the Upsey Litigation - may have exceeded PMMC's $5,000,000 SIR limit. The $78,404,669 verdict against PMMC, standing alone, triggered Steadfast's right to participate in the defense of PMMC. The exhaustion of PMMC's SIR was not a requirement for Steadfast to exercise its rights to participate in the defense of PMMC.

Policy provisions that grant insurers the discretionary right to participate in the defense of insureds have been found unambiguous, and are enforced. In *Genaeya Corp. v. Harco Nat'l Ins. Co.*, 991 A.2d 342 (Pa. Super. 2010) the Superior Court examined a defense provision which provided "We [Harco] may elect to defend you against suits arising from claims of owners of property. We will do this at our expense." The insured argued this provision was ambiguous and should be construed against the carrier. The Superior Court disagreed.

> Harco contends that this language clearly and unambiguously conveys that it has the right, rather than the duty, to defend Genaeya against such lawsuits. In other words, it is discretionary with the insurer.
> ....
> We agree with Harco that the phrase "may elect to defend" is not ambiguous and clearly conveys that Harco retains the discretion whether or not to defend Genaeya against any potential lawsuit.

*Genaeya*, 991 A.2d at 346, 347.

The Superior Court in *Genaeya* relied upon *Crozer Chester Medical Center v. Medical Professional Liability Catastrophe Loss Fund*, 713 A.2d 1196 (Pa. Cmwlth. 1998), *aff'd*, 555

Pa.558, 725 A.2d 755 (1999), which reviewed a provision within the predecessor to the MCARE Act that provided the "director of the CAT Fund 'may, at his option,' join in the defense of professional liability claims and be represented by counsel, and that the director 'is authorized' to defend any claim payable by the Fund." *Genaeya*, 991 A.2d 342, at 348, citing *Crozer*, 713 A.2d at 1199. The Commonwealth Court had determined this language granted the director the discretion to decide whether to join in the defense of a claim. *Id*. Applying *Crozer*, the Superior Court made clear the discretionary nature of Harco's rights:

> While *Crozer*, as a Commonwealth Court case interpreting statutory language relating to the administration of the CAT Fund, is obviously not controlling as to the issue *sub judice,* we agree that the word "may" clearly connotes a discretionary, rather than a mandatory, obligation. The addition of the word "elect," *i.e.,* "may elect to defend," further underscores that the decision rests with the insurer. The Random House Dictionary of the English Language defines "elect" as "to pick out; choose," or "to choose or select someone or something." Roget's Thesaurus, Fourth Edition, includes "choose" as a synonym for the verb form of the word "elect." The policy gives Harco the right to choose whether to defend a claim. We determine that the clear and unambiguous policy language created a ***right*** to defend, and did not create a ***duty*** on the part of the insurer, Harco.

*Id*. at 349 (emphasis in original).

In *E. Tex. Med. Ctr. Reg'l Healthcare Sys. v. Lexington Ins. Co.*, No. 6:04-CV-165, 2011 U.S. Dist. LEXIS 18918 (E.D. Tex. Feb. 25, 2011) (Schneider, J.), a District Court examined an excess medical malpractice liability policy that afforded Lexington the right to participate in the defense of a claim that in Lexington's "opinion, may create liability" for Lexington. Specifically, the policy stated:

> [Lexington] will not be obligated to assume charge of the investigation, settlement or defense of any claim made, suit brought or proceeding instituted against the insured. [Lexington] will, however, have the right and shall be given the opportunity to participate in the defense and trial of any claims, suits or proceedings relative to any medical incident or occurrence which, in our opinion, may create liability on our part under the terms of this policy.

*E. Tex. Med. Ctr.* at *23.

Lexington had claimed it was prejudiced by the insured's late notice of the claim, and in that context, the Court viewed the Lexington insuring grant as follows:

> Based on the plain meaning of participate,[9] and after distinguishing it from the duty to defend, it is apparent that Lexington's right to participate allowed the insurer to assist in and supplement the defense of the Cornelius lawsuit. For example, Lexington claims it would have hired monitoring counsel to participate in critical stages of the Cornelius lawsuit. Lexington admits it could not control the defense and that in the event of disagreement between itself and ETMC's defense counsel, ETMC's counsel would be the deciding vote. But contrary to ETMC's position, the right to participate could have significant value to the insurer. An insurer could assert a great deal of influence over the insured's defense even without the right to outright control the defense.

*Id*. at *25-*26.

Similarly, Steadfast had the right under the terms of the Steadfast Policy to assist and supplement (at the very least) the defense of an insured confronting a $69,216,792.35 docketed judgment. The Supreme Court in *Madison* made clear that when "language of the contract is clear and unambiguous, a court is required to give effect to that language."[10] Steadfast had the right to participate in the defense of PMMC, and that right included the retention of counsel to assist in the defense of the insured. In this instance, not only did the Schiller firm assist in the defense, it actually managed the defense, much to the benefit of both carriers. Steadfast exercising its right to participate in the defense following the verdict in the Upsey Litigation was consistent with the terms and conditions of the Steadfast Policy.

---

[9]The court had earlier looked to the dictionary definition of "participate." *Id*. at *24 ("The Merriam-Webster definition of participate is 'to take part' or 'to have a part or share in something.' Merriam-Webster's Collegiate Dictionary 845 (10th ed. 2002).").

[10]*See also Atl. Cas. Ins. Co. v. Norton*, No.: 3:12-CV-650, 2015 U.S. Dist. LEXIS 35731, *8 (E.D. Tenn. Mar. 23, 2015) (Phillips, J.) ("As a general rule, Tennessee law construes any ambiguities in an insurance policy in favor of the insured. *Griffin v. Shelter Mut. Ins. Co.*, 18 S.W.3d 195, 200 (2000). Yet, if the terms of the policy are clear, the court enforces insurance contracts 'according to their plain terms' with the language construed in its 'plain, ordinary and popular sense.' *Id*. Tennessee courts do not create a new insurance contract for the parties. *Id*.").

### C. The Payment of Defense Expenses Reduced the Limits of the Steadfast Policy

The Steadfast Policy was amended to provide that the payment of defense expenses by Steadfast reduced the limits of the Steadfast Policy.

> D. We will pay "Defense Expenses" and "Post-judgment Interest" incurred by us in the investigation or defense of any "Claim". The payment of such "Defense Expenses" and "Post-judgment Interest" **shall reduce** the Limits of Insurance provided under this policy.

Health Care Umbrella Liability Policy (HCULP), Common Policy Provisions, (U-HCU-700-B CW (07/03)), at III. Defense and Expenses for Claims, as amended by Endorsement #4, "'Defense Expenses' and 'Post-judgment Interest' Reduce Limits of Insurance Endorsement," U-HCU-734-A CW (emphasis added) (Steadfast 4539). *See* Endorsement #4 attached separately at Exh. "K."

Without Endorsement #4, the Common Policy Provisions in the Steadfast Policy provided that the payment of defenses expenses would <u>*not*</u> have eroded the available limits:

> D. We will pay "Defense Expenses" and "Post-judgment Interest" incurred by us in the investigation or defense of any "Claim". The payment of such "Defense Expenses" and "Post -judgment Interest" shall **not** reduce the Limits of Insurance provided under this policy.

HCULP, Common Policy Provisions, at III.D, <u>without amendment</u> (Steadfast 4505).

However, Endorsement No. 4 deletes the word "**not**" from the provision.

> D. We will pay "Defense Expenses" and "Post-judgment Interest" incurred by us in the investigation or defense of any "Claim". The payment of such "Defense Expenses" and "Post-judgment Interest" **shall reduce** the Limits of Insurance provided under this policy.

HCULP, Common Policy Provisions, at III.D, *as amended* by Endorsement #4, "'Defense Expenses' and 'Post-judgment Interest' Reduce Limits of Insurance Endorsement," U-HCU-734-A CW. The deletion of the word "not" from paragraph "D." is clear evidence that the intention was to reduce the Steadfast limit through the payment of defense costs. In arguing that the payment of Schiller's

fees does not reduce the Steadfast limit, Allied is pretending as if Endorsement No. 4 does not exist.

The term "Defense Expenses" means:

G. "Defense Expenses" means a payment allocated to investigate or defend a specific "Claim" to the extent that payment is not included in the "Underlying Insurance". "Defense Expenses" includes:

1. **Attorney fees and other litigation expenses incurred in the defense of a "Claim"**;
2. Reasonable attorney fees or other expenses incurred by the Insured at our request to assist us in the investigation or defense of a "Claim" or suit, including reimbursement for loss of earnings up to $100 a day because of the Insured's attendance at hearings or trials at our request;
3. Up to $1,000 for cost of bail bonds required because of accidents or traffic law violations arising out of the use of any vehicle to which Coverage A applies under the Commercial Liability- Coverages A and B Coverage Part of this policy (if attached). We do not have to furnish these bonds;
4. The cost of bonds to release attachments, but only for bond amounts within the amount of insurance available. We do not have to furnish these bonds;
5. "Pre-judgment Interest".

"Defense Expenses" do not include:

1. Salaries and expenses of our employees or any Insured's "Employees" other than that portion of those fees, salaries and expenses of attorneys employed by us allocated to a specific "Claim".
2. Fees and expenses of independent investigators or adjusters hired by any Insured.
3. Plaintiff attorney's fees and costs.
4. "Post -judgment Interest".

HCULP, Common Policy Provisions, at ¶X.G. (Emphasis added) (Steadfast 4515).

As PMMC had no obligation to pay the fees incurred by Steadfast due to Steadfast exercising its own right to participate in the defense of PMMC, Schiller's fees fell within the definition of "Defense Expenses," which are defined to include "Attorney fees and other litigation expenses incurred in the defense of a 'Claim." It is well settled that a "court must give effect to unambiguous

-13-

language in an insurance contract." *Fireman's Fund Ins. Co. v. Zurich Am. Ins. Co.*, No. 10-cv-4293, 2011 U.S. Dist. LEXIS 78906, *9-*10 (E.D. Pa. 2011) (Rufe, J.). Steadfast's legal fees incurred by participating in the defense PMMC are not included in PMMC's SIR. Steadfast possessed the right to participate in the defense of PMMC, Steadfast's payments to the Schiller firm are "Defense Expenses," and accordingly reduce the limits of the Steadfast Policy.

Provisions providing for the reduction of excess limits as a result of the payment of defense expenses have been enforced. In *Yellowbird Bus Co. v. Lexington Ins. Co.*, No. 09-5835, 2010 U.S. Dist. LEXIS 69554 (E.D. Pa. 2010) (Robreno, J.), *aff'd.*, 450 Fed. Appx. 213 (3d Cir. 2011), at issue was an underlying school bus accident that gave rise to sixty-five different claims. The limit of the primary policy of the bus company (Yellowbird) was due to be exhausted due to the settlement of claims. Yellowbird's excess insurer was Lexington, whose policy afforded Lexington the right to defend and settle any claims it deemed "expedient." *Yellowbird*, at *3-*4 ("We will defend any suit against the Insured alleging liability insured under the provisions of this policy and seeking recovery for damages on account thereof, even if such suit is groundless, false or fraudulent, but we will have the right to make such investigation and negotiation and settlement of any claims or suits as may be deemed expedient by us."). The Lexington Policy also provided "This policy shall cease to apply after the applicable limits of liability have been exhausted by payments of defense costs and/or judgments and/or settlements." *Id.* at *6. In its suit against Lexington, Yellowbird asserted that Lexington had "breached its contractual obligations by attempting to erode the policy limits with defense costs and mediation expenses."[11] The court disagreed:

Lexington counters that any erosion of the coverage on account of defense and

---

[11]The Lexington excess policy had a $4,000,000 limit. Yellowbird was concerned about its ability to defend remaining claims in the event the Lexington excess policy exhausted.

> mediation costs is consistent with the provisions of the Excess Policy. Section III.C of the Excess Policy is entitled "Limit Exhaustion" and provides "[t]his policy shall cease to apply after the applicable limits of liability have been exhausted by payments of defense costs and/or judgments and/or settlements." ... It appears from the plain language of this provision that any erosion that is occurring with respect to defense costs and mediation expenses is consistent with the express language of the Excess Policy.

*Id.* at *16-*17.

Similarly, the reduction of the Steadfast limit by the payment of Schiller's fees was consistent with the express language of Endorsement No. 4 of the Steadfast Policy. Had the Steadfast Policy not been amended by Endorsement No. 4, then the payment of Schiller's fees would not have reduced the Steadfast limit. However, the Steadfast Policy had been amended to expressly provide that the payment of defense expenses *does* reduce the limit. Compelling Steadfast to pay further monies beyond its stated limit requires that the existence of Endorsement No. 4 be disregarded.

## V. CONCLUSION

In seeking reimbursement from Steadfast for monies beyond Steadfast's stated limit, Allied is (1) ignoring a verdict that was $73,000,000 above Steadfast's underlying limit; (2) ignoring Steadfast's right to participate in the defense of a suit that in Steadfast's judgment may exceed the underlying limit; and (3) ignoring an amendment to the Steadfast Policy that expressly states the payment of defense costs reduces the Steadfast limit. One can look away only so much. The terms of the Steadfast Policy should be enforced as written.

WHEREFORE, defendant Steadfast Insurance Company respectfully requests that summary judgment be entered in its favor.

Respectfully Submitted,

  s/Louis A. Bové
Louis A. Bové, Esquire
Marc J. Syken, Esquire
PA 53071/PA 62533
BODELL BOVÉ, LLC
1529 Walnut Street
6th Floor
Philadelphia, PA 19102
Tel: (215) 864-6600
Fax: (215) 864-6610
lbove@bodellbove.com
msyken@bodellbove.com
*Attorney(s) for Defendant,*
*Steadfast Insurance Company*