IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ALLIED WORLD ASSURANCE COMPANY, | : : | CIVIL ACTION |
| Plaintiff, | : : | No. 14-2511 |
| v. | : : | |
| STEADFAST INSURANCE COMPANY, | : : : | |
| Defendant. | : | |

**MCHUGH, J.**                                                                                                                    **AUGUST  24, 2015**

**MEMORANDUM**

The parties in this litigation, two insurance companies, have filed cross motions for summary judgment.  The motions pose a narrow question about the interpretation of Defendant Steadfast Insurance Company's ("Steadfast") insurance contract with a third party that both Steadfast and Allied World Assurance Company ("Allied") insure.  For the reasons that follow, I will grant Steadfast's Motion for Summary Judgment and deny Allied's  motion.

**I.     Background**

Steadfast and Allied both provide excess liability insurance for Pottstown Memorial Medical Center ("PMMC").  PMMC self-insures for up to five million dollars.  Steadfast provides the first excess layer in the amount of twenty million dollars, and Allied provides the second excess layer in the amount of twenty-five million dollars.

On May 4, 2012, a jury entered a verdict in the amount of $78,404,669 against PMMC in a medical malpractice action.  After the verdict, Steadfast hired Ronald Schiller, Esq. of the law firm Hangley Aronchick Segal Pudlin & Schiller ("Hangley firm") to serve as counsel to PMMC in conjunction with PMMC's own counsel and continue litigating the case.  The suit eventually

settled for thirty-one and one half million dollars. Upon settlement, PMMC, Steadfast, and Allied delivered the settlement to the tort plaintiffs. PMMC paid the tort plaintiffs its five million dollar Self-Insured Retention ("SIR"). Steadfast paid the Hangley firm $751,765.00 and the tort plaintiffs $19,248,235.00 for a total of twenty million dollars. Allied paid the balance to the tort plaintiffs.

The dispute here focuses on whether the legal fees that Steadfast paid to the Hangley firm should have been counted against Steadfast's twenty million dollar policy limit. Steadfast argues that its insurance contract with PMMC gave it the discretion to participate in PMMC's defense and to count the costs of that defense against the policy limit. Allied agrees that Steadfast was permitted to hire the Hangley firm but insists that by making that discretionary decision, Steadfast took the cost of that firm on itself. According to Allied, Steadfast should have paid the entire twenty million dollar limit to the tort plaintiffs. If Steadfast had done so, then Allied's remaining obligation would have been diminished by the amount Steadfast paid to the Hangley firm. Allied filed this lawsuit to recoup that amount, and both parties have filed for summary judgment seeking a resolution of the question.

## II.     Legal Standard

Rule 56 requires courts to "grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ P. 56(a). Here, the parties have agreed that there are no material factual disputes. The only issues to resolve relate to the interpretation of Steadfast's insurance contract with PMMC. This is a question of law. "[T]he task of interpreting [an insurance] contract is generally performed by a court rather than by a jury." *Madison Const. Co. v. Harleysvill Mut. Ins. Co.*, 557 Pa. 595, 606, 735 A.2d 100, 106 (1999) (citing *Gene & Harvey Builders v.*

2

*Pennsylvania Mfrs. Ass'n*, 512 Pa. 420, 426, 517 A.2d 910, 913 (1986)); *Bishops Inc. v. Penn Nat'l Ins.*, 984 A.2d 982, 989 (Pa. Super. Ct. 2009).

As to which state supplies the governing law, Steadfast points out in its brief supporting its Motion for Summary Judgment that while the dispute focuses on events in Pennsylvania, the insurance contract was delivered in Tennessee.  Brief of Defendant Steadfast in Support of Its Motion for Summary Judgment at 7 n.6.  However, the relevant legal principles are the same in both states.  In Pennsylvania, courts interpret insurance contracts by reading the language of the contract and attempting to "ascertain the intent of the parties as manifested by the language of the written instrument." *Madison Const. Co.*, 557 Pa. at 606, 735 A.2d at 106 (citing *Gene & Harvey Builders*, 512 Pa. at 426, 517 A.2d at 913); *Am. & Foreign Ins. Co. v. Jerry's Sport Ctr., Inc.*, 606 Pa. 584, 608, 2 A.3d 526, 540 (2010) ("Insurance policies are contracts, and the rules of contract interpretation provide that the mutual intention of the parties at the time they formed the contract governs its interpretation.").  Likewise, in Tennessee, courts' "interpretation of insurance contracts … is governed by the same rules of construction used to interpret other contracts. … An insurance contract 'must be interpreted fairly and reasonably, giving the language its usual and ordinary meaning.' " *Travelers Indem. Co. v. Moor & Assocs., Inc.*, 216 S.W.3d 302, 305–06 (Tenn. 2007) (citing *Naifeh v. Valley Forge Life Ins. Co.*, 204 S.W.3d 758, 768 (Tenn. 2006)).

### III. Discussion

There are several key provisions that relate to the dispute over whether Steadfast's policy limit could be eroded by the money Steadfast spent paying counsel to assist PMMC after the jury verdict.

First, within the Common Policy Provisions, Section III, Paragraph C explains that Steadfast may—but is not obligated to—participate in the defense of a claim against an insured such as PMMC:

> C. If "Underlying Insurance" or any "Other Insurance" exists, we shall have the right, but not the duty, to participate in the investigation, settlement or defense of any "Occurrence", "Medical Incident" or "Claim" against the Insured that in our judgment may exceed that Applicable Underlying Limit".

Common Policy Provisions, Section III, Paragraph C. Section X, paragraph C of the same document defines the "Applicable Underlying Limit" as "the total of all available limits of insurance for the applicable 'Underlying Insurance' plus any 'Other Insurance.' " Here, PMMC's SIR is the Applicable Underlying Limit.

A provision amended in Endorsement Number 4 states that Steadfast *will* deduct "Defense Expenses" that it incurs from its policy limit:

> D. We will pay, as damages, "Defense Expenses" and "Post-judgment Interest" incurred by us in the investigation or defense of any "Claims". The payment of such "Defense Expenses" and "Post-judgment Interest" shall reduce the Limits of Insurance provided under this policy.

Endorsement Number 4. The Common Policy Provisions define "Defense Expenses" to mean "a payment allocated to investigate or defend a specific 'Claim' to the extent that payment is not included in the 'Underlying Insurance.' " Common Policy Provisions, Section X, Paragraph G.

Endorsement Number 5 states that the insured *may not* deduct its defense expenses from its own SIR limit. The Endorsement explains that the insured is responsible for its own "Defense Expenses," and any SIR will not be eroded by "Defense Expenses" that the Insured incurs. The limits of the SIR "may not be reduced or exhausted for any reason other than the payment of judgments or settlements which would be covered by the provisions of this policy." Endorsement 5.

4

The same Endorsement also states that when the Insured's SIR is exhausted by paying claims, Steadfast will at that point "have the right and duty to settle existing and new 'Claims' which would have been covered…" Together with paragraph C above, this means that before the SIR is exhausted, Steadfast *may* participate in the defense of claims, and once the SIR is exhausted, Steadfast will have an affirmative duty to get involved.

Plaintiff Allied argues that Steadfast's payments to the Hangley firm should not have eroded Steadfast's policy limit because the payments were not a "Defense Expense" as the term is defined and used in the contract. Allied points to the fact that "Defense Expense" is defined to exclude "payment … included in 'Underlying Insurance.' " Common Policy Provisions, Section X, Paragraph G. "Underlying Insurance" in this case includes PMMC's SIR. According to Allied, all spending on defense of a claim before the SIR is exhausted is part of the Underlying Insurance. Only once the SIR is exhausted and Steadfast acquires the "right and duty to settle existing and new 'Claims'…" does Steadfast also acquire the ability to accumulate "Defense Expenses." Endorsement 5. In other words, Allied's position appears to be that while the SIR is unexhausted, any expenses on defense the insured pays do not exhaust the SIR, and any money Steadfast spends defending claims against its insured is not a "Defense Expense." Allied's Memorandum of Law in Opposition to the Motion for Summary Judgment of Defendant Steadfast Ins. Co. at 7 ("[T]he only entity that could incur 'Defense Expenses' under the Steadfast policy before exhaustion of the SIR was the Hospital.").

Steadfast rejects Allied's interpretation requiring the SIR to be exhausted before Steadfast could make "Defense Expenses" that erode Steadfast's policy limit. Steadfast argues, "[t]here is no language in the Steadfast Policy tying the reduction of the Steadfast limit to the erosion of PMMC's SIR." Brief of Defendant Steadfast Ins. Co. In Support of its Reply to the

5

Motion for Summary Judgment of Plaintiff Allied World Assurance Company at 11. According to Steadfast, Endorsement 4 plainly declares that "Defense Expenses" by Steadfast erode its policy limit, the Common Policy provisions unequivocally permit Steadfast to participate in the Insured's defense, and there is nothing in the contract to prevent Steadfast from making Defense Expenditures before exhaustion of the SIR.

I share Steadfast's interpretation of its contract. To accept Allied's perspective, I would need to find that until the Insured exhausted the SIR, only the Insured's defense expenses are actually "Defense Expenses" as defined in the contract. I find nothing in the contract that explicitly states such a rule. Moreover, the term "Defense Expenses" is defined to include "Attorney fees and other litigation expenses incurred in the defense of a 'Claim,' " and paragraph C quoted above grants Steadfast the right to participate in the defense of claim without making reference to whether the SIR must be exhausted. Common Policy Provisions, Section X, Paragraph G(1), Definition of Defense Expenses. These provisions, read together, show the contract contemplates that Steadfast may incur Defense Expenses before the exhaustion of the SIR. Allied notes the definition of Defense Expenses does exclude payments "included in the 'Underlying Insurance.' " However, I am not persuaded Steadfast's payments to the Hangley firm are part of the Underlying Insurance.

Allied appears to argue that because Endorsement 5 provides that the Medical Center's SIR is not eroded by defense costs, Steadfast's liability limits are similarly not eroded by defense costs (until the SIR is exhausted). However, this argument overlooks the fact that Endorsement No. 5 qualifies "Defense Expenses" with the phrase, "incurred by any Insured." Allied's Memorandum of Law in Opposition to the Motion for Summary Judgment of Defendant Steadfast Ins. Co. at 6; Endorsement 5. This qualification contemplates that "Defense Expenses"

6

might be incurred by someone else. As Steadfast points out, "Schiller's bills were not attorney fees incurred *by PMMC*, and as such expressly erode the Steadfast limit." Brief of Defendant Steadfast Ins. Co. In Support of its Reply to the Motion for Summary Judgment of Plaintiff Allied World Assurance Company at 7.

Allied expresses concern that this interpretation of the contract will permit Steadfast to spend down its policy limits by hiring lawyers to defend claims. I do not see that Steadfast would stand to gain much with such a strategy. Here, Steadfast disbursed its full policy limit to its lawyers and the plaintiff in the underlying tort action. If it had not hired the Hangley firm, it also would have disbursed its full policy limit. By hiring the Hangley firm to supplement PMMC's counsel, I fail to see that Steadfast has saved itself money. In fact, because a $78 million verdict was negotiated down to a $31.5 million settlement, Schiller's work saved Allied approximately $18 million as against its $25 million policy limit. Furthermore, even if this interpretation of the contract permits Steadfast to pass extra costs to Allied, concerns about the fairness of the contract to Allied do not determine the meaning of the contract's terms.

### IV. Conclusion

For the reasons above, I will grant Steadfast's Motion for Summary Judgment and deny the Motion by Allied. An appropriate order follows.

/s/ Gerald Austin McHugh
Gerald Austin McHugh, J.
United States District

7